**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2003-CA-00587-SCT**

*TAYLER BLAILOCK, A MINOR, BY AND THROUGH*
*HIS PARENTS AND NATURAL GUARDIANS,*
*LINDA BLAILOCK AND CLIFFORD BLAILOCK;*
*LINDA BLAILOCK, INDIVIDUALLY AND*
*CLIFFORD BLAILOCK, INDIVIDUALLY*

**v.**

*DAVID HUBBS, M.D., RANDALL SISAM, D.O.,*
*WOMEN'S CLINIC OF McCOMB, PLLC AND*
*SOUTHWEST MISSISSIPPI REGIONAL MEDICAL*
*CENTER*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/06/2003 |
| TRIAL JUDGE: | HON. MIKE SMITH |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | BOBBY L. DALLAS |
| | BRAD SESSUMS |
| | WALTER C. MORRISON, IV |
| | BRYAN PATRICK DOYLE |
| ATTORNEYS FOR APPELLEES: | WHITMAN B. JOHNSON |
| | SHELLY G. BURNS |
| | R. MARK HODGES |
| | LYNDA CLOWER CARTER |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 05/26/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.	This is a medical negligence case brought against two doctors, a clinic and a governmental hospital. Although four issues are raised on appeal, the central issue is whether the trial court properly dismissed the hospital from the lawsuit for failure of the plaintiffs to

give the required notice under the Mississippi Tort Claims Act, Miss. Code Ann. §§ 11-46-1 to - 23 (Rev. 2002 & Supp. 2004).

## FACTS AND PROCEDURAL HISTORY

¶2.     Linda Blailock was admitted to Southwest Mississippi Regional Medical Center ("Southwest") on March 9, 1997, with complaints of blurred vision, elevated blood pressure, and swollen feet.   Mrs. Blailock was pregnant, but not in labor at that time.   Based on these factors, Dr. David Hubbs decided to induce labor the next day.

¶3.     When Dr. Hubbs ended his shift at approximately 7:00 a.m., Dr. Randall Sisam began care of Mrs. Blailock.   Upon examining Mrs. Blailock at approximately 1:05 p.m., Dr. Sisam found nothing abnormal.   He left Mrs. Blailock to perform another procedure downstairs. Shortly thereafter, Mrs. Blailock's condition began to deteriorate, and the nursing staff attempted to stabilize her.   At 1:18 p.m., Nurse Sharon Moak called to the nurses' station and asked that they inform Dr. Sisam that he was needed in Mrs. Blailock's room.   The time of Dr. Sisam's return to Mrs. Blailock's room is not clear.[1]   Upon his return, Dr. Sisam attempted a forceps delivery of the baby, Tayler, but noticed he was "free floating," indicating that he was not attached to the uterus.   Dr. Sisam then abandoned the forceps delivery and ordered an emergency C-section.   Mrs. Blailock was taken to the operating room at 1:40 p.m., and Tayler

_____

[1] The labor progress chart indicated that Dr. Sisam was notified of Mrs. Blailock's condition at 1:18 p.m. and that he was in her room at 1:20 p.m. Fetal monitor strips contained notations indicating that Dr. Sisam performed a vaginal exam on Mrs. Blailock at 1:30 p.m.  Other hospital records indicate that Dr. Sisam was performing a procedure on another patient from 1:27 p.m. until 1:31 p.m.  Dr. Sisam, both through his notes and his testimony, indicated that he was informed that he was needed in Mrs. Blailock's room at 1:35 p.m.

was delivered at 1:46 p.m. Due to the complications surrounding Tayler's delivery, he developed cerebral palsy and suffered other permanent injuries.

¶4. Plaintiffs filed suit against the defendant doctors on November 24, 1998. Plaintiffs claim they first became aware of Southwest's possible negligence during the deposition of Dr. Sisam on April 14, 1999. They claim that, during the deposition, they learned that (1) Dr. Sisam was operating on another patient at the times indicated in the nursing notes, (2) although Southwest's staff knew Dr. Sisam could be informed of Mrs. Blailock's condition while performing surgery on another patient, he was not informed of Mrs. Blailock's condition until after he left the operating room, and (3) the staff failed to inform Dr. Sisam of the urgency of Mrs. Blailock's situation when they contacted him.

¶5. Plaintiffs claim that these discoveries led them to file a notice of claim against Southwest on May 4, 1999, and to amend their complaint on August 4, 1999, to add Southwest as a defendant. On November 30, 2002, two days before trial began, Judge Mike Smith informed the parties that he was granting Southwest's previously filed Motion to Dismiss.[2] At the trial's conclusion, the jury rendered a verdict for the remaining defendants, and the court entered a judgment for the defendants. Plaintiffs timely filed their notice of appeal.

¶6. This appeal presents four issues: (1) proper application of the "discovery rule;" (2) apportionment of fault to Southwest; (3) whether the verdict was against the overwhelming weight of the evidence; and (4) the applicability of the minor savings clause of Miss. Code

---

[2] The order granting dismissal was entered on December 5, 2002.

Ann. § 11-46-11(4).

## ANALYSIS

### I. Application of the discovery rule

¶7. The trial court held that the plaintiffs did not file their claim against Southwest within the one-year statute of limitation for filing a claim under the Mississippi Tort Claims Act. We review a trial court's application of the statute of limitations de novo. *Wayne Gen. Hosp. v. Hayes*, 868 So. 2d 997, 1000 (Miss. 2004), citing *Sarris v. Smith*, 782 So.2d 721, 723 (Miss. 2001)). When Tayler Blailock was born in 1997, the Mississippi Tort Claims Act provided "[a]ll actions brought under the provisions of this chapter shall be commenced within one (1) year next after the date of the tortious, wrongful or otherwise actionable conduct on which the liability phase of the action is based, and not after." Miss. Code Ann. § 11-46-11(3) (1997). It is undisputed that Tayler was born on March 10, 1997, and that Southwest was added as a defendant on August 4, 1999, well after the one-year statute of limitations expired.

¶8. The gravamen of the plaintiffs' claim is that the "discovery rule" tolled the running of the statute of limitations until April 14, 1999, during the deposition of Dr. Sisam. It was at that time, plaintiffs claim, that they "discovered" the negligence of the hospital.

¶9. Plaintiffs must exercise reasonable diligence in determining whether an injury suffered is actionable. *Hayes*, 868 So. 2d at 1001 (citing *Smith v. Sanders*, 485 So.2d 1051, 1052 (Miss. 1986)). Further, [t]he discovery rule will toll the statute of limitations "until a plaintiff should have reasonably known of some negligent conduct, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent." *Hayes*, 868 So. 2d at 1000-01

4

(citing *Sarris v. Smith*, 782 So.2d at 725).

¶10. Thus, the applicability of the discovery rule in this case turns on whether plaintiffs exercised reasonable diligence in investigating possible negligence by Southwest during Tayler's delivery. The plaintiffs claim that they first learned of the delay in notifying Dr. Sisam when he was deposed in 1999. However, the medical records themselves contain information that should have alerted the plaintiffs of the need to investigate potential claims against the hospital and doctors. For instance, Dr. Sisam's notes record that, at 13:35, he was notified of Mrs. Blailock's condition, while the nurses' notes indicate that he was notified at 13:18.

¶11. Tayler's injuries were not latent. The Blailocks have been on constructive notice since his birth of potential medical negligence. The Blailocks asserted in their amended complaint, the pretrial order and at trial that Dr. Sisam should have been contacted prior to the time that the nurses' notes indicate he was contacted. The medical records indicating the notification discrepancy have been available since Tayler's birth. The Blailocks do not argue that the hospital delayed in providing the records. Nor have they shown that they were prevented from obtaining the records or that the needed information was otherwise concealed. As such, the Blailocks cannot now claim to have exercised reasonable diligence in discovering the facts upon which they now base their claim of negligence against Southwest.

¶12. The dissent correctly points out that "[t]he factual situation that the Blailocks present to this Court is *similar* to that found in *Barnes v. Singing River Hosp. Sys.*, 733 So. 2d 199 (Miss. 1999). . . .(emphasis added). The *Barnes* decision turned on this Court's determination

5

of whether the plaintiff, Lisa Barnes, was reasonably diligent in investigating and pursuing her claim. The alleged malpractice occurred in September, 1995. Lisa's attorney requested hospital records in November, 1995, at which time Lisa was still hospitalized. When the records were not forthcoming, Lisa's attorney made another request and, in January, 1996, paid for the records in advance. Nevertheless, he did not receive them until mid-February, 1996. *Id*. at 200. After obtaining the records, Lisa's attorney obtained an expert opinion concerning hospital negligence in less than 90 days.

¶13. Additionally, on June 28, 1996, Lisa's attorney provided the notice required by Miss. Code Ann. §11-46-11 (Supp. 1998). This notice tolled the statute of limitations for 95 days. *Id*. Thus, even if the **Barnes** Court had determined that the statute of limitations began to run when Lisa's attorney received the medical records in mid-February, 1996, the statutory notice tolled the statute of limitations for 95 days. Consequently, the statute of limitations would not have expired until late May, 1997, which was one year and 95 days after mid-February, 1996. Lisa filed a complaint against the hospital on March 5, 1997, which was well before May, 1997. These and other factors in the case led this Court to determine that the statute of limitations did not begin to run until May 8, 1996.

¶14. The **Barnes** decision and our decision today should serve notice that litigants and their counsel should exercise great caution when relying on the discovery rule. Evaluation of reasonable diligence turns of the facts of a particular case. The **Barnes** Court found the plaintiff and her counsel used reasonable diligence. We do not so find here.

6

¶15. The discovery rule's purpose is to protect plaintiffs "who <u>cannot</u>, through reasonable diligence, discover injuries done to them." *Hayes*, 868 So. 2d at 1001(emphasis added). The trial court did not err in refusing to toll the statute of limitations through the application of the discovery rule.

## II. Apportioning fault to an absent defendant

¶16. Secondly, the Blailocks allege that the trial court erred in failing to grant their directed verdict motion on the issue of fault allocation after Southwest was dismissed from the case because the defendant-doctors were allowed to "point at the empty chair" without offering expert testimony to show how Southwest breached the standard of care. Plaintiffs argue that the defendant-doctors should not have been allowed to rely on the opinions of Dr. John Elliott because he was not qualified by the court as an expert on nursing malpractice.[3] This argument is without merit. Dr. Elliott was the plaintiffs' own expert witness, and they stipulated that he would testify as to how the doctors and "nursing personnel at Southwest" deviated from the standard of care. "A trial judge's determination as to whether a witness is qualified to testify as an expert is given the widest possible discretion and that decision will only be disturbed when there has been a clear abuse of discretion." *Mississippi Power & Light Co. v. Cook* 832 So.2d 474, 483 (Miss. 2002) (citing *Palmer v. Biloxi Reg'l Med. Ctr., Inc*., 564 So.2d 1346, 1357 (Miss. 1990); *Sheffield v. Goodwin*, 740 So.2d 854, 856 (Miss. 1999)).

¶17. The Blailocks' argument that the defendant-doctors should not be able to mention the

---

[3] Dr. Elliott was qualified by the trial court "as a specialist in the field of OB-GYN medicine with a subspecialty in high-risk pregnancies and maternal fetal medicine."

fault of Southwest is contrary to the apportionment statute and the case law interpreting it. Under Miss. Code. Ann. §85-5-7(7), absent tortfeasors who contributed to a plaintiff's injuries "must be considered by the jury when apportioning fault. *Smith v. Payne,* 839 So. 2d 482, 486 (Miss. 2002) (citing *Estate of Hunter v. General Motors Corp*., 729 So. 2d 1264 (Miss. 1999)).

¶18.     We hold that the trial court did not err in denying plaintiffs' motion for directed verdict regarding allocation of fault.   Dr. Elliott, plaintiffs' own expert, was properly accepted as an expert, and the defendant-doctors were allowed to rely on his opinions regarding Southwest's negligence, just as the plaintiffs were.   Additionally, we hold that it was proper for the trial court to allow the jury to consider any negligence of Southwest in rendering its decision regarding the defendant-doctors.

### III.      Weight of the evidence

¶19.     The standard of review for denial of a motion for a new trial is abuse of discretion. *Anchor Coatings, Inc. v. Marine Indus. Residential Insulation, Inc*. 490 So. 2d 1210, 1215 (Miss. 1986).

*Informed Consent*

¶20.     Plaintiffs allege that the trial court erred in denying their motion for a new trial. Part of plaintiffs' claim is that Linda Blailock was not adequately informed of certain risks or procedures so as to give her informed consent, making the jury verdict contrary to the overwhelming weight of the evidence.

¶21.     We have adopted an objective test regarding the risks a doctor must disclose to a patient

8

regarding potential medical procedures and require disclosure of "those known risks which would be material to a prudent patient in determining whether or not to undergo the suggested treatment." *Hudson v. Parvin*, 582 So. 2d 403, 410 (Miss. 1991) (citation omitted). In determining whether a causal connection exists between the breach of duty to adequately inform and the resulting injury, the objective test asks "whether or not a reasonably prudent patient, fully advised of the material known risks, would have consented to the suggested treatment." *Id*. (citation omitted).

¶22. Plaintiffs charge that Linda Blailock was neither adequately informed of the risks in attempting a vaginal birth after caesarean (VBAC) procedure nor of the risks associated with the labor-inducing drugs Cervidil and Pitocin. Mrs. Blailock testified that she was never informed of the risks of a VBAC and that she "always" wanted a C-section. She also claimed to have never read either the pamphlets she signed at the health department or the informed consent forms she signed at the hospital. Dr. Elliott, plaintiffs' expert, indicated that providing Mrs. Blailock with the health department pamphlets, without further disclosure, would be insufficient for informed consent.

¶23. Defense expert, Dr. Robert Maupin, confirmed Dr. Elliott's statement. However, he also testified that the defendant-doctors did more than just provide a pamphlet and that their actions conformed to the standard of care for informed consent. In addition to producing expert testimony on the issue of informed consent, the doctors also described their own accounts of their disclosures to Mrs. Blailock. They also offered the health department pamphlet, which discussed the VBAC procedure, and the hospital's informed consent forms

9

for both a VBAC and a C-section, all of which were signed by Linda Blailock, to show she was adequately informed.

¶24. Plaintiffs also claimed that the doctors never obtained Mrs. Blailock's informed consent for the use of Cervidil and Pitocin. They allege that use of these drugs increases the risk of uterine rupture, that Mrs. Blailock was not properly informed of these risks, that she did not consent to their use, and that her uterus did rupture due to hyperstimulation brought on by the negligent use of Cervidil and Pitocin.

¶25. The defendant-doctors and the various medical experts had conflicting opinions as to whether these drugs increased the risk of uterine hyperstimulation such that a rupture may occur. The defendant-doctors admitted that they never actually disclosed any risks regarding the use of labor-inducing drugs; however, they contend that Linda Blailock's uterus did not become hyperstimulated from the use of Cervidil and Pitocin. Defendants also argued because that Mrs. Blailock allowed these labor inducers to be administered to her, she impliedly consented to their use. See *Phillips ex rel. Phillips v. Hull*, 516 So. 2d 488, 494 (Miss. 1987) (recognizing possibility of implied consent where patient did not object to tubal ligation procedure being performed on her).

¶26. Whether there was adequate informed consent regarding both the VBAC procedure and the drugs Cervidil and Pitocin was a factual dispute to be settled by the jury. Both sides introduced enough credible evidence to support a jury finding. A jury could objectively find that a reasonable patient knew or should have known of the possible risks and consented to the treatment anyway. The jury chose to believe that Dr. Hubbs and Dr. Sisam did not breach the

10

standard of care on this issue. Their finding was not against the weight of the evidence. We hold that the trial court did not abuse its discretion in denying a new trial on the issue of informed consent.

*Negligent care.*

¶27.    Plaintiffs allege that the overwhelming weight of the evidence supports a finding that the defendant-doctors were negligent in their treatment of Mrs. Blailock, such that a motion for a new trial should have been granted. Their specific allegations are that: (1) the doctors' use of Cervidil and Pitocin was negligent, (2) Dr. Sisam was negligent in monitoring Mrs. Blailock, and (3) the delay in delivering Tayler by C-section was negligent. As with the issue of informed consent, whether the defendant-doctors were negligent in their care of Mrs. Blailock entailed a dispute in testimony between the parties. Both sides offered credible evidence. Plaintiffs and their experts asserted that the doctors' acts and omissions breached the standard of care and caused their injuries. The defendant-doctors and their experts argued that the appropriate standard of care was met. The jury had sufficient evidence before it to determine that Dr. Hubbs and Dr. Sisam were not negligent in their care of Mrs. Blailock. Therefore, we hold trial court's decision to deny the plaintiffs' motion for a new trial, based on the charge of negligent care, was not an abuse of discretion.

### IV.    Minor savings clause

¶28.    The minor savings clause of the Mississippi Tort Claims Act provides that "if any person entitled to bring any action under this chapter shall, at the time at which the cause of action accrued, be under the disability of infancy or unsoundness of mind, he may bring the

11

action within the time allowed in this section after his disability shall be removed as provided by law" Miss. Code Ann. §11-46-11(4). This provision was added to the Mississippi Tort Claims Act in 2000 for all claims that existed on May 15, 2000, or would accrue thereafter. Therefore, it was not in effect in 1997 when Tayler's cause of action accrued.

¶29. In 2002, the minor savings clause was, by statute, made to apply retroactively to any causes of action that accrued on or after April 3, 1993. In *University of Mississippi Medical Center v. Robinson*, 876 So.2d 337, 340-41 (Miss. 2004), we struck down the 2002 amendment that made the minor savings clause retroactive because "[t]he legislature shall have no power to revive any remedy which may have become barred by lapse of time, or by any statute of limitations of this state." *Robinson* affirmed the constitutionality of the 2000 amendment that included the first minor savings clause, since the Legislature may lengthen statutes of limitation as they apply to existing and future causes of action. *Id.*

¶30. Since the discovery rule did not toll the statute of limitations in the case sub judice, Tayler's cause of action lapsed on March 10, 1998. The minor savings clause, adopted over two years later, cannot alter that fact. Therefore, the trial court did not err in holding that it would be improper to apply the minor savings clause to this cause of action.

## CONCLUSION

¶31. The trial court did not err in refusing to apply the discovery rule and the minor savings clause. Nor did the trial court abuse its discretion in denying the Blailocks' motion for a directed verdict regarding fault allocation and in denying the Blailocks' motion for a new trial

12

as the jury's verdict was not against the overwhelming weight of the evidence. Therefore, we find no error and affirm the trial court's judgment.

¶32. **AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**GRAVES, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶33. I agree with the majority that the trial court did not err in denying both the Blailocks' motion for a directed verdict and motion for a new trial. I differ from the majority in that I would find that the Blailocks did timely file their notice of claim against Southwest Mississippi Regional Medical Center and that the minor savings clause does apply to the instant case. Therefore, I respectfully dissent in part.

¶34. The factual situation that the Blailocks present to this Court is similar to that found in *Barnes v. Singing River Hospital Systems*, 733 So. 2d 199 (Miss. 1999), where a plaintiff with non-latent injuries was given the benefit of the discovery rule. The plaintiff in *Barnes* had several of her limbs amputated after developing sepsis. *Id.* at 200. Though her injuries were apparent as of the date of amputation, the plaintiff did not become aware of her negligent medical treatment until roughly six months later, after her attorney consulted a medical expert. *Id*. at 204. The defendant hospital argued that the notice of claim was not timely filed, yet this Court applied the discovery rule to find that the complaint was filed within one year of discovering the hospital's negligent conduct. *Id*. In disclosing its rationale for applying the

13

discovery rule, this Court stated:

> [T]hus, where an injury or disease is latent, a determination of when the statute of limitation begins to run focuses not on the time of the negligent act or omission, but on when the plaintiff discovers the injury or disease. Moreover, **knowledge that there exists a causal relationship between the negligent act and the injury or disease complained of is essential because 'it is well-established that prescription does not run against one who has neither actual nor constructive notice of facts that would entitle him to bring an action**.'

*Id.* (citing *Sweeney v. Preston*, 642 So. 2d 332, 334 (Miss. 1994) (emphasis added).

¶35. The holding and rationale from *Barnes* should be applied to the Blailocks in the instant case. The Blailocks were not put on notice as to Southwest's possible negligence until having the opportunity to depose Dr. Sisam. It was at this time that they were finally able to learn, from Dr. Sisam's own testimony, of hospital staff conduct which arguably contributed to Tayler's injuries. His testimony expounded on the notations from the available medical records and enabled the Blailocks to gain a more complete understanding of just what happened the day Tayler was born.

¶36. In affirming the trial court, the majority finds that the Blailocks should not benefit from the discovery rule because they were not reasonably diligent in discovering the basis for their claim against Southwest, imputing to them knowledge of notations from various medical records. In fact, the trial court based its decision to dismiss Southwest from the suit largely on the fact that Dr. Sisam's note "Called to see pt @ 13:35" contradicted another hospital record stating that he was notified at 1:18 p.m.

¶37. The mere existence of a time discrepancy in the medical charts is not enough, in and

of itself, to put the Blailocks on notice that they had a claim against Southwest. This is especially true in light of the tenuous position in which MTCA plaintiffs find themselves. Under the MTCA, plaintiffs such as the Blailocks are faced with losing their claim if they fail to file a notice of claim within one year; however, they also face the possibility of being assessed with attorney's fees and costs under the Litigation Accountability Act of 1988, Miss. Code Ann. §§ 11-55-1 to  -15 (Rev. 2002), if they bring suit without a sufficient factual basis. See *Barnes*, 733 So. 2d at 202.

¶38.    On the one hand, plaintiffs are criticized and may be sanctioned if they rush to file suit against all who may be responsible, and on the other, they are subject to have their claims dismissed if they are careful and deliberate in determining against whom a suit should be filed. The decision reached by the majority today penalizes the Blailocks for their decision to file suit against Southwest only after they had a sufficient factual basis to support their claims. I cannot support such a decision.

¶39.    Since I would find that the plaintiffs timely filed their notice of claim against Southwest, I would conclude that they had viable claims on  May 15, 2000, the applicable date for the minor savings clause. As such, I would also find that the statute of limitations had not run on their claims on this date, and that Tayler Blailock should be given the benefit of the minors savings clause of Miss. Code Ann. § 11-46-11(4).  Thus, I would reverse the judgment dismissing Southwest and remand this case for trial of the plaintiffs' claims against Southwest.